UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KENOBI RAMIREZ,**<br><br>   **Plaintiff,**<br><br>v.<br><br>**HECTOR LORA AND LUIS GUZMAN, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES, AND THE CITY OF PASSAIC, A MUNICIPAL CORPORATION,**<br>   **Defendants.** | Civ. No. 18-11230 (KM) (MAH)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

  Plaintiff Kenobi Ramirez is an officer with the City of Passaic's police department ("PPD"). In June 2018, Ramirez commenced this action against the City of Passaic ("the City"); its mayor, Hector Lora ("the Mayor" or "Mayor Lora"); and its Chief of Police, Luis Guzman. (DE 1.)[1] The complaint contains

---

[1]  Certain citations to the record are abbreviated as follows:

 DE = Docket entry in this matter

 City St. = Statement of undisputed material facts in support of the City's first motion for summary judgment (DE 79-2)

 Pl Resp. = Ramirez's response to City's first statement of undisputed material facts (DE 85-3)

 City St. 2 = Statement of undisputed material facts in support of the City's second motion for summary judgment (DE 108-3)

 Pl. Resp. 2 = Ramirez's response to City's second statement of undisputed material facts (DE 113-1)

 Op. = Opinion on first round of summary judgment motions (DE 94)

 City Mot. = Memorandum of law in support of the City's second motion for summary judgment (DE 108-1)

1

five counts, two of which were dismissed in May 2022 when the Court granted partial summary judgment to the defendants. (DE 95.) Defendant Guzman was also dismissed from the case at that time.

What remains of the complaint is a claim that Mayor Lora retaliated against Ramirez for Ramirez's support of an opposing mayoral campaign by making sure that Ramirez would not be promoted to sergeant. This claim is brought pursuant to both 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"). The City is allegedly liable for the Mayor's retaliation on a theory of *respondeat superior*.

Fact discovery was reopened following the Court's decision on the first summary judgment motions. (DE 98.) In December 2022, Mayor Lora and the City separately moved for summary judgment again, arguing that Ramirez has failed to produce, in reopened fact discovery, sufficient evidence to support his remaining retaliation claim. (DE 108, 109.) Those motions are presently before the Court. For the reasons set forth below, the motions for summary judgment are **GRANTED**.

I.      **Background**[2]

The City of Passaic is a civil service jurisdiction, meaning that promotions within the PPD are governed by a competitive examination process overseen by the New Jersey Civil Service Commission ("the Commission"). (City St. 2 ¶1; Pl. Resp. 2 ¶1.) After an examination is administered, the Commission generates a list ranking each officer who sat for the examination based on their test score, seniority, and disciplinary record. (*Id.*) The City may promote officers in order of their ranking on the list until that list expires and a new list is issued. (City St. ¶30; Pl. St. ¶18.)

---

Opp. = Ramirez's memorandum of law in opposition to the City's and the Mayor's second summary judgment motions (DE 113)

[2]     These facts are drawn primarily from the statements of undisputed facts submitted by the parties in conjunction with the current summary judgment motions and those statements submitted in conjunction with the prior motions.

Ramirez sat for the 2014 civil service examination and was thereafter ranked 19th on the 2014 sergeant's promotional list ("the 2014 List"). (City St. 2 ¶2; Pl. Resp. 2 ¶2.) The 2014 List was effective from December 18, 2014, to December 17, 2017. (City St. ¶52; Pl. St. ¶37.)

Between December 18, 2014, and August 29, 2017, the City promoted 18 officers to sergeant. (City St. ¶60; Pl. Resp. ¶39.) Ramirez was thus at the top of the sergeant's promotional list for a period of three and a half months, from August 29 to December 17, 2017. No promotions to the rank of sergeant were made during that period, however. (City St. 2 ¶12; Pl. St. 2 ¶5.) In fact, the PPD did not promote anyone in any rank during that period or in the next nine months thereafter, until September 2018. By that time, a new list (the "2018 List") had been released based on the 2017 examination, and Ramirez was ranked 48th. (City St. ¶65; Pl. Resp. ¶42.) Only fifteen officers were promoted from the 2018 List. (City St. 2 ¶14; Pl. Resp. 2 ¶5.)

Although the City is permitted to employ up to 24 sergeants at one time, it is not required to do so. (City St. ¶43; Pl. Resp. ¶32.) Since Guzman became Chief of Police in October 2016, the PPD has operated with as few as 16 sergeants and has rarely had 24 sergeants. (City St. 2 ¶8; Pl. Resp. 2 ¶5.) The City employed a total of 22 sergeants during the few months in 2017 that Ramirez stood at the top of the promotional list. (City St. 2 ¶6; Pl. Resp. 2 ¶3.)

Ramirez believes that Mayor Lora is responsible for his not being promoted to sergeant despite reaching the top of the promotional list in 2017. That spring, Ramirez's sister, Jeanny Ramirez, ran for Passaic City Council on a ticket headed by Richard Diaz, who sought to replace Mayor Lora. Ramirez claims that Mayor Lora retaliated against him for his support of his sister's campaign by ordering the PPD to pause all sergeant promotions once Ramirez reached the top of the promotional list. (City St. ¶70; Pl. Resp. ¶45.)

In ruling on the first round of summary judgment motions, I observed that the only direct proof in support of Ramirez's retaliation claim is his own sworn statement that Deputy Chief Gentile told him in the fall of 2017 that he and another officer were not getting promoted because of their support for the

Diaz campaign. (Op. 8, 15.) Ramirez submitted this sworn statement after the close of fact discovery in response to the defendants' first summary judgment motions. (Op. 12.) Curiously, Ramirez did not mention this conversation with Gentile at his deposition, despite having been asked why he believed his non-promotion was the result of his support for his sister's campaign. (Op. 15.) Ramirez did mention a conversation that he had with Gentile in the summer of 2017, during which Gentile told him that he "did not see why I would not get promoted if someone retired." (*Id.*) Yet, until he was confronted by the defendants' first motions for summary judgment, Ramirez inexplicably failed to recall this alleged second conversation with Gentile—which occurred only a few months after the first conversation and after two sergeants had retired—in which Gentile admitted the essentials of Ramirez's claim.

True, Ramirez never actually *denied* that Gentile made such a statement during his deposition, which would have rendered his subsequent affidavit contradictory. For that reason, I rejected the defendants' arguments that the evidence regarding Ramirez's second conversation with Gentile should be set aside pursuant to the sham affidavit doctrine. (Op. 13-16.)

> Giving Ramirez the benefit of the doubt, I concluded as follows:
>
> With the new affidavit as part of the record, Ramirez has successfully raised a disputed issue of material fact: whether Deputy Chief Gentile told him in September or October 2017 that he was not promoted as a result of his support of his sister's campaign. To be truly significant, of course, that admission would have to be accompanied by some evidence that Gentile, if he made the statement, was not merely, *e.g.,* repeating rumors, but was speaking from knowledge about the Mayor's decision.

(Op. 16.) As I had emphasized earlier in the decision, "this disputed fact could support a finding that defendants' failure to promote Ramirez constituted political retaliation by the City or the Mayor—*if* a jury found that Gentile made the statement and *if* they also found a basis to believe that Gentile knew what he was talking about." (Op. 12.)

In light of Ramirez's late disclosure and the lack of any opportunity to explore it previously in discovery, I permitted defendants to reopen fact discovery on this narrow issue and resubmit revised summary judgment motions. (Op. 17.) Defendants re-deposed Ramirez, and these second summary judgment motions followed.

## II.     Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "A fact is material if—taken as true—it would affect the outcome of the case under governing law. And a factual dispute is genuine if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *M.S. by and through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (quotation marks and citation omitted).

### III. Discussion

#### A. Evidence of retaliation

To establish a claim of discrimination based on political association under § 1983, a plaintiff must prove that "(1) [he] was employed at a public agency in a position that does not require political affiliation, (2) [he] was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007) (citing *Stephens v. Kerrigan,* 122 F.3d 171, 176 (3d Cir. 1997)). If the plaintiff can prove those three elements of a prima facie case, defendants can nevertheless "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Galli*, 490 F.3d at 271. With few exceptions, the NJCRA and 42 U.S.C. § 1983 have been construed in parallel. *Perez v. Zagami, LLC*, 218 N.J. 202, 212 (2014). Accordingly, the same elements that apply to Ramirez's § 1983 claim apply to his claim under the NJCRA.

For purposes of the current motion, the first two elements of a prima facie case of political association discrimination are uncontested; Ramirez is a public employee, and it is not controversial that the First Amendment protects political speech and association.[3] The parties focus on the third element, *i.e.*, whether Ramirez's protected political conduct "was a substantial or motivating factor in the government's employment decision." *Galli*, 490 F.3d at 271.

Ramirez is not making the common, straightforward case for discrimination consisting of proof that a less qualified person was promoted in

---

[3] Whether Ramirez actively engaged in substantial campaign activity on behalf of his sister, or the Mayor knew he had done so, remain largely unexplored by the parties, who may have perceived that these would present issues of fact.

his stead. Rather, he contends that *no* promotions occurred in a three-month period when his test score would have placed him next in line. The defendants, for their part, have introduced evidence that it was far from unusual for the City to have 22, rather than the maximum of 24, sergeants at any particular time. *See* p.3, *supra*.[4] Now I am sensitive to the difficulty of proving discriminatory intent, and open to a case based on circumstantial evidence. Here, however, that evidence does not meet the summary judgment standard.

As mentioned above, the critical evidence that Ramirez's non-promotion constituted retaliation for his support of his sister's candidacy on the Diaz slate is Deputy Chief Gentile's alleged statement, first reported in Ramirez's affidavit in opposition to summary judgment.[5] Assuming that statement occurred, Defendants argue that there is no evidence in the record indicating that Gentile's admission was based on personal knowledge, rather than rumor or speculation. Before addressing this argument, I will summarize the relevant evidence that has been added to the record since the prior round of summary judgment briefing.

At Ramirez's supplemental deposition, which took place in August 2022, defense counsel asked him if he possessed any evidence that Gentile was speaking from actual knowledge when Gentile told Ramirez why he was not going to be promoted. (DE 108-2, Ex. A, "Ramirez Dep." 340:9-13.) Ramirez responded that he did not. At one point he proffered that he believes Gentile and Mayor Lora are friends "because [Gentile]'s next in the list for chief" and because he has seen the pair talk to one another at events. (*Id.* 316:5-11.)

---

[4] For the plan truly to work, of course, the defendants would have had to predict in 2017 that Ramirez would earn a lower score on the sergeant's exam for 2018, placing him too far down the list for promotion when the next promotions occurred.

[5] Resisting this conclusion, Ramirez points to other evidence that he believes supports his claim, such as Officer Ragsdale's sworn statement that Captain Pellot told him that he and Ramirez were not getting promoted for political reasons. (Opp. 7.) I considered this evidence in my prior summary judgment opinion and determined that it does not create a genuine issue for trial. (Op. 12, n. 11.) That determination remains unchanged.

7

Specifically, Ramirez saw the two together at a food distribution event that was held when "COVID became an issue" (*i.e.,* sometime after approximately February 2020). (*Id.* 316:22-317:18.)

Asked a separate time if he had any evidence that Gentile was not simply repeating rumors, Ramirez said "no," but proffered yet another belated account of an oral statement by Gentile, reported secondhand and six years after the fact:

> No. But I spoke two months ago with Captain Pellot, and he told me the same thing that -- I asked him do -- do you remember anything about my promotion. And he said well, Lieutenant Callahan request via emails that he need more sergeants in his shift. And Gentile approached Pellot, and Pellot told him that he had to promote the next people because Callahan was requesting more supervisors. And he said no that I was not getting promoted because my low score and because I was supporting Richie Diaz. And Captain Pellot told him that he don't care -- he didn't care about politics. He need to -- to promote the next people, and he said no, because I was supporting Richie Diaz.

(*Id.* 336:9-24.)

The defendants have supplemented the record with the affidavits of the alleged hearsay declarant, Deputy Chief Gentile, as well as Chief Guzman. (DE 108-5, "Gentile Aff."; DE 108-7, "Guzman Aff.") In his recent affidavit, Gentile states that he does not recall any conversation with Ramirez in the fall of 2017 regarding Ramirez's prospect of a promotion. Gentile additionally states that he does not believe he told Ramirez he would not be getting promoted for political reasons. (Gentile Aff. ¶¶3-4.) If he did make such a statement, however, "it would have been based purely on [ ] opinion or rumor rather than a statement based on personal knowledge," as Gentile was a newly appointed deputy chief at the time and would not have been privy to such knowledge. (*Id.*) According to Gentile, he had only limited interaction with Mayor Lora during his first few years as a deputy chief and was not involved in any discussions regarding promotions with the Mayor. (*Id.* ¶8) Since 2020, his relationship with Mayor Lora has developed due to their interactions at public events. (*Id.* ¶7.)

Ramirez's belief that Gentile is friends with the Mayor, says Gentile, is the result of seeing the pair speak at such events, which post-date the onset of the COVID pandemic. (*Id.*)

Chief Guzman similarly states in his affidavit that Gentile would not have been privy to any actual knowledge regarding Ramirez's prospects for promotion in the fall of 2017. (Guzman Aff. ¶15.) Guzman states that from the time that Ramirez reached the top of the promotional list in August 2017 until the publication of the new list in May 2018, there were no promotional discussions within the PPD. (*Id.*) Assuming Gentile had actual knowledge of the Mayor's animus toward Ramirez, then, Gentile would have to have acquired that knowledge prior to August 2017 (given the lack of promotional discussions after that date). Yet, according to Ramirez, Gentile told him in the summer of 2017 that he saw no reason Ramirez would not get promoted if someone retired. (*Id.* 17.) This timeline, says Guzman, does not leave room for Gentile to have learned of the Mayor's animus from a legitimate source.

Ramirez argues that Chief Guzman's statement in his affidavit about the lack of promotional discussions in the PPD between August 2017 and May 2018 contradicts his prior deposition testimony. (Pl. Resp. 2 ¶8.) When asked during his deposition if he recalled in 2017 ever having "a discussion with Mayor Lora about needing more sergeants," Guzman responded as follows:

> I don't specifically remember a conversation. I'm always looking to promote more people, I mean, if there's a chance that I can get someone promoted or have more sergeants to beef up my shifts in my specialized unit or the PD. And it wouldn't just be about sergeants, it would be about lieutenants, it would be about hiring more cops. I'm always looking to get more. But a specific conversation, I don't necessarily recall one, but I would imagine I did.

(DE 113-2, "Guzman Dep." 35:2-18.)

The contradiction is far from stark. In his deposition, Guzman said he did not specifically recall having a conversation on the general subject of promotions, but "would imagine" he had such a conversation. In his testimony,

9

Guzman said he did not have promotional discussions in the relevant period. The contradiction, then, would be between what Guzman could recall, and what he "would imagine" could have occurred, some five or six years after the fact. More to the point, however, there is nothing in either version that bears on the specific issue at hand: any political motive for engineering a denial of *Ramirez's* promotion by the means of suspending all promotions. Guzman's deposition testimony, even if credited over the affidavit, merely demonstrates that, although he had no specific recollection, generalized conversations about promotions may have occurred during the period in which Ramirez was at the top of the list. Guzman's testimony does not establish that Ramirez's candidacy was ever specifically discussed. Indeed, when focused on that particular issue in the same deposition, Guzman testified to the contrary: According to Guzman, he and Mayor Lora do not discuss the names of individual candidates for promotion. Guzman explained, "[t]he who is not spoken about. It's the how many. The number is what we talk about." (Guzman Dep. 29:24-30:6.)

 Finally, there is no evidence that Gentile—the person whose secondhand account is the essential basis for Ramirez's claim—was involved in, or knew about, any such conversations between the Mayor and Guzman. To the contrary, the evidence suggests that he did not. The procedure, according to Guzman, is that promotional decisions are made following a conversation between Guzman and the Mayor in which Guzman tells the Mayor, "I need X amount of supervisors, and [the Mayor] reviews it and decides if there is a need." (Guzman Dep. 26:17-23.) While Guzman testified that he speaks to his subordinates, including deputy chiefs and captains, in order to determine what the needs of the department are, nothing indicates that deputy chiefs such as Gentile speak directly with the Mayor about promotions or are privy to the Mayor's thinking on the subject. (*Id.* 28:9-29:5.)

 In sum, there is no evidence to suggest that Mayor Lora told Deputy Chief Gentile directly that Ramirez would not be promoted because of his support for the Diaz ticket. It is no more than mildly suggestive that Ramirez believes Gentile is friendly with the Mayor. And even that belief is premised

solely on Ramirez's seeing the two together at events held in and after 2020; the record does not show that the two interacted on any substantial basis in 2017 and early 2018.

It is, of course, possible, or at least not impossible, that Gentile could have learned secondhand that the Mayor told Chief Guzman of his animus towards Ramirez. But there is nothing in the record to show that this possibility ever materialized. Little is added by Ramirez's latest deposition testimony that Gentile allegedly told Pellot the same thing he told Ramirez, *i.e.,* that Ramirez could not be promoted because the Mayor resented his support for the Diaz ticket. (Ramirez Dep. 336:9-24.) This evidence (which incorporates layers of hearsay), like the earlier evidence, fails to support a conclusion that Gentile had any personal knowledge supporting such a belief.

After the first summary judgment motion, I kept the record open to explore the possibility that, assuming a belatedly-recalled statement by Gentile had occurred, Ramirez could establish the other precondition for its relevance: that it "be accompanied by some evidence that Gentile, if he made the statement, was not merely, *e.g.,* repeating rumors, but was speaking from knowledge about the Mayor's decision." (Op. 16) Put another way, Gentile's alleged statement would be relevant only "*if* a jury . . . found a basis to believe that Gentile knew what he was talking about," as opposed to speculating. (Op. 12.) This record would not permit a jury finding to that effect. Gentile himself denies having made the statement about the Mayor's motivations in the first place; the Mayor and Guzman deny its substance; and they offer convincing evidence that Gentile would not have had a basis for knowledge, rebutted only by weak evidence of a friendly association between Gentile and the Mayor at a time years after the relevant period.

Viewed in its entirety, and construed in favor of Ramirez, the record does not create a genuine issue for trial. No reasonable jury could conclude, by a preponderance of the evidence, that Ramirez's support for the Diaz campaign

"was a substantial or motivating factor" in his non-promotion. *Galli*, 490 F.3d at 271. Accordingly, the retaliation claims against Mayor Lora are dismissed.[6]

### B. Monell/Respondeat Superior

Turning to Ramirez's claim against the City, it is axiomatic that "[a] municipality cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior*." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Rather, "[a] plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by the municipality's policy or custom." *Thomas, supra* (citing *Monell, supra* at 690-691). The same is true under the NJCRA. *See Winberry Realty P'ship v. Borough of Rutherford*, 247 N.J. 165, 190 (2021).

That Ramirez's claim against the Mayor must be dismissed suggests but does not automatically entail that he has no claim against the City. As the Third Circuit has recently recognized, "[a] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Mervilus v. Union Cnty.*, 73 F.4th 185, 196 (3d Cir. 2023) (quotation omitted). Indeed, "[s]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation." *Id.* (quotation omitted).

Here, assuming *arguendo* that there could be a basis for municipal liability independent of the Mayor's liability, no such basis is presented. Because there is no evidence in the record of a City-wide policy or custom of

---

[6] Whether the defendants have provided adequate evidence of an alternative reason for Ramirez's non-promotion is irrelevant. Only if Ramirez succeeds in making out a prima facie case of political discrimination does the burden shift to the defendants to demonstrate that there was another, non-discriminatory reason that Ramirez was not promoted. *See Galli*, 490 F.3d at 271. Because Ramirez has failed to produce sufficient evidence to support a prima facie case, defendants have no obligation to produce evidence of their own.

retaliation that led to Ramirez's non-promotion for exercising his First Amendment rights, Ramirez's claim against the City must be dismissed.

### C. Sanctions

Finally, I indicated in my prior summary judgment opinion that I would entertain an application to have Ramirez pay the additional costs and attorney's fees incurred by defendants as a result Ramirez's belated disclosure regarding his second conversation with Gentile. (Op. 17.) The City, in its briefing, makes a one-paragraph gesture toward an application for such an award. It has not, however, specified a legal basis, and it continues to characterize Ramirez's affidavit as a "sham affidavit," which I have ruled is not quite the case. Nor has it specified or documented any additional costs.

At any rate, it has become clearer that the fault would lie with a non-lawyer client, not with the attorney (which might be a basis for sanctions under, *e.g.*, 28 U.S.C. § 1927). I have ruled that this claim, which depends substantially on the motivation and state of mind of the Mayor, is not supported by sufficient evidence. By the same token, however, I do not wish to discourage aggrieved persons from filing such claims, even if they are by their nature difficult to prove. Accordingly, the Court will exercise its discretion to deny the application for an award of additional fees and costs.

### IV. Conclusion

For the reasons set forth above, the defendants' motions for summary judgment are **GRANTED**. The City's application for reasonable fees and costs incurred as a result of plaintiff's belated disclosure is **DENIED**. An appropriate order will issue.

Dated: August 11, 2023

/s/ Kevin McNulty
_____
Kevin McNulty
United States District Judge